[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-16128

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 29, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-14032-CR-KMM

UNITED STATES OF AMERICA

Plaintiff-Appellee,

versus

JAMES JOSEPH BROWN

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(April 29, 2008)**

Before TJOFLAT, FAY and SILER,* Circuit Judges.

TJOFLAT, Circuit Judge:

Pursuant to a plea agreement, James Joseph Brown pled guilty to using a

facility and means of interstate commerce to entice a minor to engage in sexual

_____

*Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting
by designation.

activity, in violation of 18 U.S.C. § 2422(b). The district court sentenced him to prison for a term of 235 months. He now appeals his conviction and sentence.

I.

A.

On April 30, 2004, at around 7:30 a.m., Brown, who was logged onto an America Online chat room called "Fam Taboo," initiated a conversation via Instant Messenger with an undercover St. Lucie County, Florida, Sheriff's Office detective posing as a member of the chat room.[1] The St. Lucie County Sheriff's Office was participating in a multi-agency task force (the "Task Force") involving federal, state, and local law enforcement agencies, that investigated Internet crimes against children. Among other things, the Task Force was monitoring Internet chat rooms, including Fam Taboo. They suspected that members of the Fam Taboo chat room were involved with incest and the trading of child pornography.

During his initial conversation with the detective, Brown identified himself as "dad of 13 and 17 daughters" and asked the detective if he had "family fun."

---

[1] The facts set out above are taken from the Presentence Investigation Report ("PSI") prepared by the district court's probation office and adopted by the court. Brown made no objection to the PSI's narration of what led to Brown's conviction; thus, Brown is deemed to have admitted these facts. See United States v. Shelton, 400 F.3d 1325, 1330 (11th Cir. 2005).

2

Brown identified his interests as "work, sex, camping, sex, nudist, sex, harleys, sex, lol and my daughters" and asked the detective how long he had been "playing" with his "daughter," whom the detective had described as being fourteen years old and mentally ill. Brown expressed an interest in having sex with her and inquired: "would you trade her? . . . I mean if I brought my girl [for you to have sexual intercourse with] . . . would you swap yours I'm being very real."[2] Brown and the detective discussed meeting later that day, at which point Brown explained that he would not be able to bring his daughter to the meeting, as she was in school, but offered the detective $100 to have sexual intercourse with his daughter. The detective agreed to this proposal, and Brown ended the online conversation by giving him his telephone number and asking him to call.

The detective called within an hour, and Brown again expressed an interest in sexual intercourse with the detective's daughter. They arranged a meeting at a Holiday Inn in Fort Pierce. Brown lived in Pompano Beach, 100 miles away, so it would take him about two hours to get there. He told the detective that he should arrive at the Holiday Inn shortly before 11:00 a.m. Brown provided a physical

_____

[2] The PSI states that Brown has two daughters, although it does not indicate their ages. Brown did not specify, nor does the record reflect, which daughter he was referring to in his online conversation with the detective. There is no evidence in the record to indicate that Brown was ever arrested or charged with sexually abusing his daughters.

description of himself, stated that his name was "Gator" and that he would be driving a red Dodge truck.[3] The detective asked that Brown bring gifts for his daughter and a condom.

At approximately 10:50 a.m., Brown, driving a red Dodge truck, arrived at the Holiday Inn. He brought a video camera, which, he explained to the detective, he intended to use to videotape the sexual encounter with the detective's daughter, and a stuffed animal and large lollipop as presents for her. At that point, Brown was arrested, and a search of his person revealed that he was carrying a condom.

During the week following his arrest, Brown was interviewed by several Task Force agents. He told them that, prior to leaving for Fort Pierce and the Holiday Inn, he told his wife and a co-worker[4] that he was going there to see someone he had met in a chat room, who had offered to let him have sex with his fourteen-year-old daughter, and that if a girl happened to be in the hotel room where they would be meeting, he would call the police. The agents subsequently learned that Brown had not said these things to his wife and co-worker before driving to Fort Pierce on April 30.

---

[3] Brown's wife was interviewed by St. Lucie County police officers after Brown's arrest. She stated that her husband's AOL "screen name" was "Gatorbrown01."

[4] Brown was the manager of two-person sprinkler repair company, Gator's Sprinkler Service.

B.

Brown was indicted by a Southern District of Florida[5] grand jury on May 27, 2004, on one count of violating 18 U.S.C. § 2422(b).[6] On August 3, 2004, Brown appeared before the district court with his retained attorney, Jason Kreiss, and tendered a plea of guilty. During his colloquy with the court, Brown stated that he was taking three medications for schizophrenia. The court asked him if the medication had any effect on his ability to understand the proceedings; he said that it did not and that he was ready to plead guilty. The court directed the same question to Kreiss. He stated that the medication appeared to be affecting Brown adversely as Brown's "affect" at that moment was markedly different from what he had observed in meeting with him earlier. The court, concerned with Brown's competency to plead guilty, ordered that Brown be examined. Brown received a

---

[5] Although the record is not clear on this point, we presume that Brown's case was transferred from the St. Lucie County Sheriff's Office to a federal agency that was a participant in the Task Force.

[6] The version of 18 U.S.C. § 2422(b) in effect at the time of Brown's offense states:

(b) Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 5 years and not more than 30 years.

psychiatric evaluation at the Federal Correctional Institution in Waseca, Minnesota, and was found to be competent.[7]

On April 27, 2005, Brown, having entered into a plea agreement with the Government, tendered a plea of guilty to the § 2422(b) offense. The plea agreement stated that "the defendant and the [United States Attorney's Office] stipulate to the following applications of the sentencing guidelines in computing [an] advisory guideline range: Base Offense Level 21; Use of Computer & Internet Access +2; Acceptance of Responsibility -3." The Government reserved the right to seek an additional two-point upward adjustment for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, based on Brown's attempt to get his wife and co-worker to tell the authorities that he intended to call the police once he arrived at the Holiday Inn. The agreement contained no stipulation regarding Brown's criminal history category; that would be determined by the court's probation office.

The plea agreement also provided that "any recommendation that government makes to court as to sentencing . . . is not binding on the court." The

---

[7] The court ordered that Brown be examined for his sanity at the time of the offense in addition to his competency to plead guilty or stand trial. Brown does not challenge his competency to enter the guilty plea at issue; nor does he contend that he was insane at the time of the offense.

court could "depart from the advisory sentencing guideline range . . . and . . . impose any sentence within and up to the statutory maximum authorized by law for [his] offense."[8]

During the April 27, 2005, plea hearing, the court first established that Brown was currently taking psychiatric medication and then asked him whether the medication "affect[ed] in any way [his] ability to understand the proceedings." Brown stated that it did not. The court also asked Brown's counsel if he "was aware of any reason why his medication might affect his ability to enter a knowing and voluntary plea." Kreiss responded in the negative and added that Brown was "a different person today, as the court could probably see also, if you remember the way he presented last time we were here. I have no reason to believe that there are any competency issues at this time."

The court then asked Brown whether he "had received a copy of the [i]ndictment pending against [him] in this case and [had he] fully discussed those charges and the case in general with [his] attorney?" Brown replied that he had. Next, based on Brown's response to a series of questions, the court confirmed,

---

[8] The plea agreement contained a provision whereby Brown waived the right to appeal his sentence unless it was above the statutory maximum or the result of an upwards departure from the Guidelines range established by the court. In entertaining Brown's guilty plea, the court failed to address this provision and therefore did not determine whether Brown had agreed to it voluntarily. As the Government properly concedes, the provision is therefore invalid and unenforceable. See United States v. Bushert, 997 F.2d 1343, 1351-52 (11th Cir. 1993).

among other things, that Brown (1) understood the rights attendant upon a jury trial and that he was waiving such rights; (2) understood the terms of the plea agreement and that no one had made any "other or different promise[s] or assurance[s] to him" other than those recited in the plea agreement; (3) that Brown could receive a prison sentence of up to thirty years; (4) that the Sentencing Guidelines were advisory; (5) and that the terms of the plea agreement are "merely recommendations to the court" and that the court could "impose a sentence that is more severe than you may anticipate."

The court asked the prosecutor, Assistant United States Attorney Jim McAdams, to recite the "government's evidence if the case were to go to trial."[9] McAdams did so, reciting substantially what we have set out in subpart A., supra, and Brown stated that his recitation was correct. The court then informed Brown of the elements of his offense, as stated in the indictment, and asked him how he was pleading.[10] Brown replied: "Guilty, your honor." The court accepted Brown's plea.

---

[9] On October 20, 2004, McAdams replaced Deborah Stuart, the Assistant United States Attorney who had been prosecuting Brown's case since its inception.

[10] The court asked: "[H]ow do you plea to the Indictment which charges you with attempting to knowingly persuade and induce an individual who had not attained the age of 18 years of age to engage in sexual activity under such circumstances as would constitute a criminal offense: guilty or not guilty?"

8

C.

On August 29, 2005, the court's probation office issued a Presentence Investigation Report (PSI). The PSI found Brown's base offense level to be 21 pursuant to U.S.S.G. § 2A3.2(a)(2), enhanced it by two levels under U.S.S.G. § 2A3.2(b)(3) because Brown used a computer to facilitate his travel to engage in prohibited sexual conduct, and two further levels under U.S.S.G.§ 3C1.1 for obstruction of justice. Then, crediting Brown with acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a)(b), the PSI reduced Brown's offense level by three levels, arriving at a total offense level of 22.

The PSI revealed that Brown had been convicted of nineteen prior offenses as an adult, and several more as a juvenile. The probation office was able to consider only two of these offenses in calculating Brown's criminal history score, however, because the other offenses had occurred over fifteen years prior to the instant conviction. U.S.S.G. § 4A1.2(e)(3). Using these two offenses, the probation office set Brown's criminal history score at six, which yielded a criminal history category of III. Given a total offense level of 22 and a criminal history category of III, Brown's sentence range came to 51-63 months.

On July 28, 2005, we decided United States v. Searcy, 418 F.3d 1193, 1198 (11th Cir. 2005), holding that a violation of 18 U.S.C. § 2422(b) should be

considered a "crime of violence" under U.S.S.G. § 4B1.1. Section 4B1.1

mandates that a defendant convicted of a "crime of violence," who had been

convicted of two prior crimes of violence (or "controlled substance offenses"),

should be considered a "career offender" and receive enhancements of both his

offense level and his criminal category.

Following Searcy's publication, the probation office issued an addendum to

the PSI recommending that Brown be sentenced as a career offender. The

addendum identified three of Brown's prior offenses as predicate "crimes of

violence": (1) a December 21, 1979, conviction on one count of aggravated

burglary in Strongsville, Ohio, in violation of Ohio Rev. Code Ann. § 2911.11;[11]

(2) a May 29, 1980, conviction on three counts of aggravated burglary in Parma,

---

[11] The version of Ohio Rev. Code Ann. § 2911.11 in effect as of the time of the offenses indicated in the above text read as follows:

> A) No person, by force, stealth, or deception, shall trespass in an occupied structure, as defined in section 2909.01 of the Revised Code, or in a separately secured or separately occupied portion thereof, with purpose to commit therein any theft offense, as defined in section 2913.01 of the Revised Code, or any felony, when any of the following apply:
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
> (2) The offender has a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code, on or about his person or under his control;
> (3) The occupied structure involved is the permanent or temporary habitation of any person, in which at the time any person is present or likely to be present.
> (B) Whoever violates this section is guilty of aggravated burglary, an aggravated felony of the first degree.

Ohio; (3) a February 4, 1994, conviction on one count[12] of aggravated burglary in

Cleveland, Ohio.[13]

As evidence for the December 21, 1979 conviction, the probation office

downloaded and printed out a docket sheet from the Cuyahoga County, Ohio,[14]

Court of Common Pleas website. The docket sheet stated that Brown had pled

guilty to "Count I of the indictment" which had charged a "felony of the first

degree." As evidence supporting the latter two convictions, the probation office

---

[12] The PSI, and supporting documentation, indicated that Brown had been convicted on January 31, 1990 for six counts of aggravated burglary in Cleveland, Ohio. These convictions were later reversed on appeal, after which Brown pled guilty to one count of aggravated burglary on February 5, 1994.

[13] Prior convictions may only be considered in determining a defendant's criminal history score if the defendant was convicted or incarcerated for the offense within fifteen years of the instant offense, U.S.S.G. § 4A1.2(e)(3); the same rule governs whether a conviction can be considered as a predicate offense for the career offender enhancement. U.S.S.G § 4B.1.2, comment (n.3). Pursuant to this rule, of the three prior offenses discussed in the above text, the initial PSI counted only the February 4, 1994, conviction in calculating Brown's criminal history score. The addendum to the PSI stated, however, that "according to the State of Ohio, Department of Rehabilitation and Correction," Brown was incarcerated for the May 29, 1980, offense until December 1999, making that offense eligible to be considered as predicate for the imposition of the career offender enhancement. The addendum did not make any similar correction regarding the December 21, 1979, conviction.
    Since Brown was supposedly incarcerated for the May 29, 1980, offense until December 1999, but was then convicted of additional aggravated burglaries on January 31, 1990, see note 12, supra, this leads to the question of whether Brown was actually incarcerated for the May 29, 1980 aggravated burglary conviction within the required fifteen-year period prior to the instant offense. Nonetheless, Kreiss did not present this question to the district court, nor did the Federal Public Defender, who represents Brown in this appeal, raise it in Brown's brief to this Court. We therefore do not address the question of whether the district court erred in finding that the May 29, 1980, conviction constituted a § 4B1.2 predicate offense.

[14] Strongsville, Parma, and Cleveland are all located in Cuyahoga County, Ohio.

11

accumulated certified copies of Brown's indictments for the May 29 and February 4 offenses and downloaded docket sheets from the Cuyahoga County, Ohio, Court of Common Pleas website. The indictments showed that Brown had been charged with aggravated burglary, in violation of Ohio Rev. Code Ann. § 2911.11, for entering residences. The docket sheet reflecting the May 29, 1980, conviction stated that a "James J Brown" had pled guilty to three counts of "Agg Burglary . . . in viol of T RC 2911.11 as 1st Degree Felonies." The docket sheet reflecting the February 4, 1994, conviction, also referring to a "James J Brown" stated:

> [S]aid defendant retracts his / her former plea of not guilty heretofore entered, and for plea to said indictment says he/she is guilty of aggravated burglary, R.C. 2911.11 (AGG F-1) as amended in count one of the indictment, which plea/pleas on the recommendation of the prosecuting attorney is/are accepted by the court.

Once the PSI classified Brown as a career offender, it set his total offense level at 31 and his criminal history category at VI. This resulted in a Guidelines sentence range calling for a prison term of 188 to 235 months.

## D.

Brown's sentencing hearing was scheduled for October 17, 2005. That day, prior to the hearing, Kreiss filed an objection to two aspects of the PSI. He argued that the retroactive application of Searcy violated the Ex Post Facto Clause, and, alternatively, that the evidentiary bases for the three Ohio aggravated burglary

convictions being used as predicate offenses for the career offender enhancement were insufficient. Specifically, he claimed that the probation office's use of the indictments and docket sheets as evidence of Brown's prior convictions for aggravated burglary was barred by the Supreme Court's decision in Shepard v. United States, 544 U.S. 13, 125 S. Ct. 1254, 161 L. Ed. 2d 205 (2005). He did not, however, contend that aggravated burglary under Ohio Rev. Code § 2911.11 was not a "crime of violence"; rather his argument focused solely on the impermissibility of the evidence used by the probation office to determine that Brown had in fact been convicted of aggravated burglary.

The district court considered these objections after convening the sentencing hearing. The court first addressed and rejected Kreiss's Ex Post Facto argument, explaining that "ex post facto goes to statutory maximum possible penalties." The court continued, stating:

> I mean you are trying to inject that into the sentencing guidelines. And we'll get to it from the standpoint that I think the first thing we need to do in terms of process is to go through the calculation of the guidelines and the appropriate provisions, make sure that we've hit them, and then go ahead and disagree with that calculation and then we'll just put them aside and accept the guidelines as advisory, including the career offender provision, and we will sentence him outside the guidelines to the same sentence and say it's reasonable.
>
> I mean is that what you want to do? We'll give you two bites at the apple. We will give you a guideline sentence and then we'll give you

13

a sentence outside the guidelines that is reasonable because its [sic] consistent with the guidelines that you are objecting to. I mean, actually we could give you more than that. We could give you up to the statutory maximum and consider that reasonable when you look at his record.

Kreiss replied, "And I understand that."

The court further stated:

So I mean, I think the first thing to do then is to go through how the guidelines were calculated, make sure that we've calculated them correctly, if you think there is any guideline provision that has not been calculated correctly, then we can identify that and you can preserve that for appellate review, and we will go through the whole process and then when we've finished with that then we'll take up guideline sentence outside–we will take up a sentence outside the guideline, and make a determination of what is a reasonable sentence outside the guidelines, and that way if for some reason we've miscalculated the guidelines then we can, the appellate court can either correct us on that, or they can consider in the alternative the sentence that is imposed outside the guidelines and determine whether it's reasonable.

The court then considered the evidence the probation office had obtained in support of the Ohio convictions and Kreiss's objections to the sufficiency of that evidence. The court first reviewed the docket sheet submitted as evidence of the 1979 conviction and asked the prosecutor: "Mr. McAdams what [the sheet states] is a felony in the first degree. Does this require that it be a crime of violence? And do we know what the felony was?" McAdams explained that the probation office had been unable to obtain an official judgment for the conviction, but had

14

contacted a probation officer in Ohio who said that the "felony" was an aggravated burglary. The court declined to consider the 1979 conviction as a predicate offense, holding that the docket sheet and hearsay testimony were insufficient to show by a preponderance of the evidence that Brown had been convicted of aggravated burglary.

The court then reviewed the indictment and docket sheet printout indicating that Brown had pled guilty to an aggravated burglary on May 29, 1980. Kreiss argued that "[t]his is exactly the scenario Shepard speaks of. We have a charging document which is completely generic talking about trespassing on an occupied dwelling and a computer printout. This Court, in order to determine that this is a crime of violence, needs to know what he actually pled to, what was in the plea colloquy, what facts were admitted or denied."

The court replied: "[The docket sheet] says he pled guilty to aggravated burglary. It says it right in here. That's what he was charged with too. What do you think – he was charged with jaywalking?" The court concluded that "aggravated burglary is a crime of violence . . . as a matter of law" and that the evidence presented by the Government was sufficient to show that Brown had been convicted of aggravated burglary on May 29, 1980. Relying on this reasoning, the court also found, over Kreiss's objection, sufficient evidence to

15

show that Brown had been convicted of aggravated burglary on February 4, 1994. The court also asked the prosecutor to obtain additional evidence in support of the 1979 conviction, "in case this comes back." Having sustained none of Kreiss's objections, with the exception of the 1979 conviction, the court held that Brown was subject to a Guidelines sentence of 188 to 235 months.

The court then stated it would consider the sentencing factors listed in 18 U.S.C. § 3553 and asked Kreiss whether "he had anything with respect to a sentence that would be a reasonable sentence using the guidelines as simply advisory." Kreiss acknowledged Brown's "extensive criminal history," but characterized Brown as a product of his "horrific, abominable childhood." He noted that Brown had been heavily abused by his father, who had been investigated for murdering Brown's mother and two stepmothers. He also stated that Brown's prior offenses "all occur[red] within a small amount of time where many of these sentences were consolidated for sentencing purposes."

Kreiss then presented testimony from Cathleen Nunez, Brown's sister. She testified that their childhood consisted of both physical and sexual abuse from a very young age. She stated that their father "beat [Brown] senseless as a child," one time cracking open his head, and "locked him in the attic for days" without food. As teenagers, they were kicked out of the house, and Nunez testified that

16

she survived on account of Brown's burglaries, which allowed them "to pay for the apartment and get groceries."

After Nunez's testimony concluded, the court presented the rationale for the sentence it contemplated imposing. It reviewed the PSI, stating "I thought I heard defense counsel say that he was, his offense occurred in a short period of time, but according to the PSI . . . I count the first of approximately 38 arrests that we know of start[ing] at age 15 when he was charged with burglary." The court then recited into the record all of the prior arrests that were listed in the PSI. The court next stated that it should consider the factors listed under § 3553 and recited the factors listed in this statute. It then asked for any allocution by Brown.

Brown, exercising his right of allocution, told the court that his prior burglaries began "as a matter of survival," but "became . . . a habit." He explained that he "never hurt a person in [his] life" and "never went into a home when anybody was home or [it] was occupied." He emphasized his struggle with mental illness and how much he had turned his life around since being released from prison in 1999 by getting married and starting his own sprinkler repair company, until "this bad judgment happened."[15]

---

[15] The PSI states that Brown was imprisoned in Ohio, based on his January 31, 1990, conviction, see note 12, supra, from June 1, 1990, until December 2, 1999.

17

Upon the conclusion of Brown's testimony, the court sentenced Brown to 235 months imprisonment, followed by five years of supervised release. The court found that "the sentence is consistent with the guidelines calculation as well as a finding that it was a reasonable sentence considering the guidelines as advisory."

## II.

Brown argues that the district court failed to comply with the requirements of Federal Rule of Criminal Procedure 11 in entertaining and accepting his plea of guilty and that his plea was therefore involuntary, in violation of the Fifth Amendment. Brown failed to present this argument to the district court; consequently, we review the court's acceptance of his guilty plea for plain error. United States v. Moriarty, 429 F.3d 1012, 1018-19 (11th Cir. 2005) (per curiam). Under this standard, Brown must establish "(1) error (2) that is plain and (3) that affects [his] substantial rights." United States v. Monroe, 353 F.3d 1346, 1349 (11th Cir. 2003) (quotation omitted). In addition, to obtain the vacation of his guilty plea, Brown must demonstrate "a reasonable probability that but for the error, he would not have entered the plea." United States v. Dominguez Benitez, 542 U.S. 74, 83, 124 S. Ct. 2333, 2340, 159 L. Ed. 2d 157 (2004). In essence, he must convince us that "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Monroe, 353 F.3d at 1349 (quotation and

18

citation omitted).

A.

The requirements of Rule 11 serve to ensure that the district court addresses three core concerns in entertaining a plea of guilty: (1) that the plea is free from coercion; (2) that the defendant understands the nature of the charges presented; and (3) that the defendant knows and understands the consequences of pleading guilty.  United States v. Siegel, 102 F.3d 477, 481 (11th Cir. 1996).  The court has wide latitude in satisfying these core concerns.  "[T]here is no one mechanical way or precise juncture that a district court is required to inform the defendant of the nature of the charges in the Rule 11 colloquy."  United States v. Wiggins, 131 F.3d 1440, 1443 (11th Cir. 1997).  The extent of the court's explanation of the elements of the charged offense depends largely on the complexity of the elements, see United States v. Byrd, 804 F.2d 1204, 1205-06 (11th Cir. 1986), and the defendant's "sophistication and intelligence."  United States v. Bell, 776 F.2d 965, 968-69 (11th Cir. 1985) (quotation and citation omitted).

Brown states in his brief that at the time he pled guilty, in April 2005, he was taking two psychiatric drugs, medication that could have caused him to suffer from "drowsiness, fatigue, and difficulties in concentration."  Knowing this, the court should have read the indictment to him, "explain[ed] the elements of the

19

offense or any of the technical terms like intent which were necessary for a conviction,"[16] and inquired as to whether he understood the elements or had any questions as to their meaning. But the court failed to do this, he submits, and, in the process, failed to ensure that he understood the nature of the charges against him, a core concern of Rule 11.[17]

Brown's representation as to how the psychiatric drugs he was taking might have been affecting him at the time he tendered his guilty plea has no bearing on our plain error analysis. The psychiatrists who had evaluated Brown had found

---

[16] Brown's brief does not provide any further detail as to the specific elements of the § 2422(b) offense the court should have explained more fully. As indicated in note 10, supra, and accompanying text, the court, in advising Brown of the offense with which he had been charged, read the charge as it appeared in the indictment.

[17] The text of Rule 11 reads, in relevant part, as follows:

(1) Advising and Questioning the Defendant. Before the court accepts a plea of guilty or nolo contendere, the defendant may be placed under oath, and the court must address the defendant personally in open court. During this address, the court must inform the defendant of, and determine that the defendant understands, the following: . . . (G) the nature of each charge to which the defendant is pleading. Fed. R. Crim. P. 11(b)(1)(G) (2002).

Brown does not contend that the district failed to follow the text of Rule 11; rather, he contends that the court failed to satisfy one of the Rule's core concerns. The district court's satisfaction of the core concerns, rather than its literal compliance with the dictates of the Rule, is the focus of our review. See United States v. Monroe, 353 F.3d 1346, 1354 (11th Cir. 2003) ("This Court has upheld plea colloquies that fail to address an item expressly required by Rule 11 so long as the overall plea colloquy adequately addresses these three core concerns.").

him competent to proceed – either on a plea of guilty or with a trial.  When the Rule 11 plea hearing began, the court questioned both Brown and Kreiss as to whether the psychiatric "medication [would] affect in any way [Brown's] ability to understand the proceedings."  Both stated that it would not.  The court therefore proceeded to entertain Brown's plea.

The court's failure to explain the elements of Brown's offense – as it would in charging a jury – or question Brown as to his understanding of those elements, while not ideal, did not amount to plain error.  Brown was certainly aware of the elements of his offense.  The court asked him if he had discussed the indictment and the plea agreement, both of which listed the elements of the § 2422(b) offense, with his attorney and he affirmed that he had done so.  In addition, the court recited the elements before accepting his plea of guilty.  See Wiggins, 131 F.3d at 1442 (holding no Rule 11 violation for failure to explain elements of offense and finding it material that "the district court at least incorporated the substance of those elements in a statement later on in the plea colloquy").  Brown was also aware of what the Government could establish were the case to proceed to trial; the prosecutor provided a full statement of the facts the evidence would establish.  The elements of the offense were not complex or difficult to understand.  With the exception of "means of interstate commerce," the elements had the same meaning

21

in legal usage as in ordinary usage.  See, e.g., Oxford English Dictionary (2d ed. 1989) (defining knowingly as "intelligently, consciously, intentionally, etc"); Black's Law Dictionary (8th ed. 2004) (defining knowingly as "[d]eliberate; conscious, a knowing attempt to commit fraud").  The phrase "means of interstate commerce" was explained by the indictment's statement that America Online was the "means" Brown used.  Brown claimed to have a college degree and had extensive experience with the criminal justice system.  See Bell, 776 F.2d at 969 (holding that two college credits and involvement in real estate business were sufficient to classify defendant as "sophisticated and intelligent").

Given these circumstances, it is difficult for us to imagine how Brown could have failed to understand the elements of his offense, even absent a detailed explanation from the district court.  Id. at 971 ("This case is unlike McCarthy [v. United States, 394 U.S. 459, 89 S. Ct. 1166, 22 L. Ed. 2d 418 (1969)], where the Supreme Court [holding that Rule 11 had been violated] was able to point out several specific, 'conceivable' ways in which the defendant may have misunderstood the elements of the crime with which he was charged."); see United States v. Caballero, 159 Fed. Appx. 902, 907 (11th Cir. 2005) (unpublished) (holding, on similar facts, that the district court's failure to explain the elements of Caballero's offense did not constitute plain error).

Nor has Brown convinced us that even if the district court had explained the elements of the offense, he would have rejected the plea, as <u>Dominguez Benitez</u> requires as a condition to relief. In <u>United States v. Steele</u>, we listed three factors that we would consider in determining the "relative significance of the Rule 11 error on the defendant's plea decision: later protests by the defendant (for example, at sentencing), the overall strength of the government's case, and possible defenses that appear from the record." 148 Fed. Appx. 823, 826-27 (11th Cir. 2005) (unpublished). Brown, focusing on the third factor, as he must, given the absence of a later protest and the overwhelming strength of the Government's case, argues that this case

> was a sting operation which did not actually involve any actual minor at any stage of the offense. Such scenarios raise the possibility of entrapment defenses or defenses relating to a lack of criminal intent. There is nothing in the record to show that Brown understood he was waiving such defenses, and the court's deficient colloquy regarding the natures of the charges did not cure this problem.

We understand Brown to mean that had the court more fully explained the elements of his offense, he would have perceived the existence of these defenses and elected to stand trial.

In considering Brown's argument, we fail to see how the district court's explanation could have made a difference – Brown or, more realistically speaking,

Kreiss, assuming his competence, would have recognized the possibility of raising these defenses in reviewing the circumstances giving rise to Brown's arrest, independent of what the district court said to Brown during the plea colloquy. Moreover, given the significant weaknesses in these defenses, even if Brown or Kreiss were first alerted to the existence of these defenses at the sentencing hearing, we are not convinced that a reasonable defendant would have forgone this plea agreement to risk these defenses at trial. See United States v. Murrell, 368 F.3d 1283, 1287-88 (11th Cir. 2004) (rejecting Murrell's argument that he lacked the specific intent to violate § 2422(b) when no actual minor was involved); United States. v. Roberts, 174 Fed. Appx. 475, 480 (11th Cir. 2006) (unpublished) (affirming district court's rejection of entrapment defense to § 2422(b) offense when "Roberts initiated contact with the government's undercover investigator"). Brown has not convinced us that an in-depth explanation of the elements of his offense – say, in the language the court would have used in instructing the jury at the end of a § 2422(b) trial – would have altered his decision to plead guilty.

B.

Brown also argues that the district court violated a core concern of Rule 11 by failing to inform him of the consequences of his plea – specifically, the possibility that he could be sentenced as a career offender. Had Brown been aware

24

of that possibility, he claims, he would not have pled guilty.

Brown points to no provision of Rule 11 or judicial decision requiring that the district court inform a defendant of the potential sentencing enhancements that could apply under the Guidelines. Rather, our decisions hold that Rule 11 requires only that the court inform the defendant of the maximum statutory penalty that could be imposed and ensure the defendant is aware of the Guidelines and has discussed them with counsel. United States v. Mosley, 173 F.3d 1318, 1327-28 (11th Cir. 1999); Fed. R. Crim. P. 11(b)(1)(H),(M). Rule 11 does not require that a district court make the defendant aware of possible Guideline sentencing enhancements. See United States v. Bozza, 132 F.3d 659, 661 (11th Cir. 1998); United States v. Pearson, 910 F.2d 221, 223 (5th Cir. 1990) (holding that Rule 11 does not require district court to inform defendant of possibility of career offender enhancement); Fed. R. Crim. P. 11 advisory committee's note (1989) ("Since it will be impracticable, if not impossible, to know which guidelines will be relevant prior to the formulation of a presentence report and resolution of disputed facts, [Rule 11] does not require the court to specify which guidelines will be important or which grounds for departure might prove to be significant.").

C.

In addition to his Rule 11 challenges, Brown argues that his guilty plea is

invalid under the Due Process Clause, because it was induced by a misrepresentation by the government. Brown contends that the probation officer handling his case and the prosecutor assured Kreiss, who in turn assured him, that he would not be subject to the career offender enhancement if he pled guilty. See Mabry v. Johnson, 467 U.S. 504, 509, 104 S. Ct. 2543, 2547, 81 L. Ed. 2d 437 (1984) ("[A] plea of guilty . . . must stand unless induced by threats . . . . [or] misrepresentation (including unfulfilled or unfulfillable promises)") (quotation omitted); Finch v. Vaughn, 67 F.3d 909, 914 (11th Cir. 1995) ("[W]hen the defendant pleads guilty on a false premise in the prosecution's plea agreement, a guilty plea violates the Due Process Clause.") (quotation omitted).

In support of his argument, Brown proffers an affidavit from Kreiss which states, in part,

> Prior to entering the agreement, I conducted extensive research to determine whether or not Mr. Brown would be subject to the career offender enhancement . . . . This included extensive conversations with prosecuting attorneys . . . and United States Probation Officers. The understanding of everyone involved in those conversations was that Mr. Brown was not subject to the 4B1.1 career offender enhancement . . . . I believed and was assured [by the United States Attorney's Office] that the career offender enhancement was inapplicable, and I advised Mr. Brown accordingly. I can also state, having had several conversations with Mr. Brown during the course of the case, that Mr. Brown would never have entered into the plea agreement had he thought there was any possibility the career offender enhancement would apply.

26

Our "inherent equitable powers allow [us] to supplement the record with information not reviewed by the district [court], though this power is not often exercised." Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1555 (11th Cir. 1989). Such supplementation, however, is entirely inappropriate in reviewing a case for plain error. In conducting plain error review, we examine the record before the district court for error that is "clear or obvious." We are looking over the trial judge's shoulder, examining what was before the judge. Kreiss's affidavit was not before the district court; hence, we decline to supplement the record and consider it. See United States v. Richardson, 166 F.3d 1360, 1361 (11th Cir. 1999).

As Kreiss's affidavit indicates, Brown's due process claim rests on factual allegations, the veracity of which we cannot ascertain from the record before us. In this respect, Brown's due process claim is similar to an ineffective assistance of counsel claim, which we generally will not hear on direct appeal, because the claim frequently requires the development of facts outside the original record on appeal. See United States v. Bender, 290 F.3d 1279, 1284 (11th Cir. 2002). As with an ineffective assistance of counsel claim, Brown's claim is best resolved in a collateral proceeding under 28 U.S.C. § 2255, where the district court will have an opportunity to convene a hearing, entertain the relevant evidence, and make

27

findings of fact.  We therefore decline to reach the merits of Brown's claim.

## III.

Brown challenges his sentence on four grounds.  First, the district court's retroactive application of Searcy and consequent application of the career offender enhancement denied him due process – specifically, a fair warning of the consequences of his criminal conduct.  Second, the court's use of the Ohio court's docket sheets to find that he had been convicted of two predicate offenses violated his Sixth Amendment right to have a jury determine the existence of those convictions.  Third, his sentence is unreasonable.  Fourth, the court demonstrated substantial bias and prejudice toward him at the sentencing hearing, thereby depriving him of his due process rights to a fair hearing.  We address each ground in turn.

We review de novo constitutional challenges to a sentence, assuming they are properly preserved.  See United States v. Paz, 405 F.3d 946, 948 (11th Cir. 2005).  We review the reasonableness of a sentence under the abuse of discretion standard.  Gall v. United States, 552 U.S.___, 128 S. Ct. 586, 597, 169 L. Ed. 2d 445 (2007).  In so doing, we "consider the final sentence, in its entirety, in light of

the [18 U.S.C.] § 3553(a) factors."[18] United States v. Valnor, 451 F.3d 744, 750 (11th Cir. 2006) (quotation and citation omitted). A sentence is unreasonable if it "fails to achieve the purposes of sentencing as stated in section 3553(a)." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005). Brown "bears the burden of establishing that the sentence is unreasonable in the light of both [the] record and the factors in section 3553(a)." Id.

## A.

The Due Process Clause guarantees "the right to fair warning" of the "attaching of criminal penalties to what previously had been innocent conduct." Rogers v. Tenn., 532 U.S. 451, 459, 121 S. Ct. 1693, 1698-99, 149 L. Ed. 2d 697 (2001). Consequently, the "judicial construction of a criminal statute," which would criminalize conduct innocent when the offense was committed, will violate the Due Process Clause if it is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." Id. at 461, 121 S. Ct.

---

[18] The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, (C) to protect the public from further crimes of the defendant, and (D) to provide the defendant with needed educational or vocational training or medical care; (3) the kinds of sentences available; (4) the Sentencing Guidelines range; (5) pertinent policy statements of the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; (7) and the need to provide restitution to victims. See 18 U.S.C. § 3553(a)(1)-(7).

at 1700 (quotation omitted).[19]

Brown argues that the retroactive application of Searcy violated the Due Process Clause. He notes that the Guidelines define a "crime of violence" as "any offense under federal or state law . . . that (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) . . . otherwise involves conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2. A § 2242(b) offense, Brown argues, "do[es] not necessarily implicate a serious risk of physical injury to another." Therefore, he reasons, Searcy's conclusion that § 2242(b) was, as a matter of law, a crime of violence under § 4B1.2 was "unexpected and indefensible," and, consequently, he lacked fair warning that his offense could trigger a career offender enhancement and result in a twenty-year prison sentence.[20]

---

[19] Although Kreiss inaptly invoked the Ex Post Facto Clause in support of his objection – the Ex Post Facto Clause only applies to legislation – we understand him to have substantively objected to the retroactive application of Searcy on the ground that Brown lacked sufficient notice that he would be penalized as a career offender. Therefore, we consider Brown as having properly preserved a Due Process Clause objection.

[20] Brown's argument rests on the premise that the Due Process Clause requirement of fair warning applies to a judicial decision that increases the penalty for an offense, rather than to a decision that criminalizes conduct innocent at the time of commission. The Supreme Court, however, has never held that the Due Process Clause requires fair warning as to the consequences of criminal conduct, nor have we. In at least two prior decisions, however, we have assumed arguendo that the Due Process Clause does so apply, and we make this assumption again here. See United States v. Duncan, 400 F.3d 1297, 1307 n.12 (11th Cir. 2005); Metheny v. Hammonds, 216 F.3d 1307, 1311 n.13 (11th Cir. 2000).

It is not necessary for us to reach the issue of whether Searcy was an "unexcepted and indefensible" decision[21], as Brown's argument is foreclosed by United States v. Duncan, 400 F.3d 1297, 1306-08 (11th Cir. 2005). In United States v. Booker, the Court issued two majority opinions: the first, by Justice Stevens, held that the Sixth Amendment required that a sentence be based solely on facts found by the jury or admitted to by the defendant, thereby making the Sentencing Guidelines, as they then operated, unconstitutional. 543 U.S. 220, 244, 125 S. Ct. 738, 756, 160 L. Ed. 2d 621 (2005). The second, by Justice Breyer, remedied this constitutional violation by severing the provisions of the Sentencing Reform Act of 1984 which made the Guidelines mandatory. Id. at 245, 124 S. Ct. at 756-57. Duncan was sentenced before Booker was decided. 400 F.3d at 1300. The jury found him guilty of possession of cocaine with intent to distribute, warranting a base offense level of 32; the district court subsequently found that Duncan had also been in possession of cocaine base, which increased his offense level to 38. Id. Duncan sought the benefit of the retroactive application of Booker's constitutional holding, which he argued would reduce his sentence by invalidating the district court's fact finding, thereby making him

---

[21] Although were we to reach this issue, we doubt we would hold in Brown's favor. See Niederstadt v. Nixon, 505 F.3d 832, 837 (8th Cir. 2007) (en banc) ("A ruling on an unsettled issue of . . . law will rarely if ever be unexpected and indefensible.").

subject only to the sentence authorized by the jury verdict. Id. at 1306-07. He further argued that Booker's remedial holding should not be applied retroactively, because that holding would make the sentence authorized by the jury verdict the statutory maximum, rather than the lower sentence he would have received under the retroactive application of Booker's constitutional holding,[22] and that he lacked fair warning, in violation of his due process rights, that he would be subject to the statutory maximum, rather than a sentence based on the Guidelines. Id. at 1307.

We explained that Duncan, despite having committed an offense when the Guidelines were mandatory, was on notice that "the law of this Circuit [as established in United States v. Sanchez, 269 F.3d 1250, 1268 (11th Cir. 2001)] . . . recognized the U.S. Code as the source of the maximum sentence." Id. at 1308. Moreover, "the Guidelines . . . also informed Duncan that a judge would engage in fact-finding to determine his sentence and could impose up to a sentence of life imprisonment." Id. at 1307. Consequently, "Duncan . . . had ample warning at the time he committed his crime that [receiving the statutory maximum] was a potential consequence of his actions. Applying the principles announced in Rogers [v. Tenn, 532 U.S. 451, 121 S. Ct. 1693, 149 L. Ed. 2d 697 (2001)],

_____

[22] This argument presumed that if Booker's constitutional holding were applied retroactively, but the remedial holding were not, then the Guidelines would remain mandatory, but would not allow the imposition of any sentencing enhancement based on a finding by the district court.

Duncan's due process rights cannot be said to have been violated." Id. Brown, following our reasoning in Duncan, had sufficient notice when he committed his offense that he could be sentenced to the statutory maximum attendant on that offense, which was thirty years, ten years more than the sentence he received based on the career offender enhancement. The retroactive application of our holding in Searcy is simply immaterial to the issue of whether Brown had the constitutionally required "fair warning."

B.

Brown's objection to the use of the Ohio docket sheets as evidence of his prior convictions for aggravated burglary rests entirely on the Supreme Court's decision in Shepard v. United States, 544 U.S. 13, 125 S. Ct. 1254, 161 L. Ed. 2d 205 (2005). Brown reads Shepard as holding that the Sixth Amendment prohibits the use of all but judicial records of "conclusive significance" to provide evidence of a prior offense as a predicate for the imposition of the career offender enhancement. See id. at 25, 125 S. Ct. at 1262. The Ohio docket sheets, Brown contends, fall beneath the standard of "conclusive significance" purportedly established in Shepard, because they are uncertified and the Cuyahoga County Clerk's website from which they were downloaded warns users that "only the official court records . . . available in person, should be relied upon as accurate."

33

Therefore, Brown claims, the court's use of the Ohio docket sheets to establish the existence of his prior convictions was a violation of his Sixth Amendment right to have a jury make that determination.

Brown's argument rests on a fundamental misunderstanding of the process by which a district court determines whether a defendant is subjected to a career offender enhancement. This determination proceeds in two stages. First, the district court must determine if the defendant has been convicted of the prior offense. In so determining, the court may consider "any information, including reliable hearsay, regardless of the information's admissibility at trial, provided that there are sufficient indicia of reliability to support its probable accuracy" as evidence of a prior conviction. United States v. Andrews, 953 F.2d 1312, 1319 (11th Cir. 1992) (quotation and citation omitted). The court may find that a defendant was previously convicted for a certain offense without treading on the Sixth Amendment. See United States v. Shelton, 400 F.3d 1325, 1329 (11th Cir. 2005).

Second, the court must determine if the prior offense constitutes a "crime of violence" as defined in U.S.S.G. § 4B1.2.[23] In so doing, the court should initially

_____

[23] The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that - - (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

34

look to the judgment of conviction and the statute under which the defendant was convicted. See United States v. Spell, 44 F.3d 936, 938 (11th Cir. 1995). If the judgment is ambiguous or the statute overbroad, i.e., it penalizes conduct that may not constitute a crime of violence as defined in § 4B1.2, then the court may only consider the types of evidence permitted by United States v. Taylor, 495 U.S. 575, 110 S. Ct. 2143, 109 L. Ed. 2d 607 (1990), and its progeny, Shepard, in determining whether the conduct for which the defendant was convicted constitutes a crime of violence.[24] See United States v. Aguilar-

----

(2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2.

[24] In both Shepard v. United States, 544 U.S. 13, 20-21, 125 S. Ct. 1254, 1259-60, 1261,161 L. Ed. 2d 205 (2005) and United States v. Taylor, 495 U.S. 575, 600-02, 110 S. Ct. 2143, 2159-60, 109 L. Ed. 2d 607 (1990), the Court limited the type of evidence a sentencing court could consider in determining whether a state conviction for burglary was based on facts that would qualify it as a "violent felony" under the Armed Career Criminals Act ("ACCA"), 18 U.S.C. § 924(e).

The ACCA states that burglary is a violent felony, but does not define the elements of burglary. The Taylor Court held that the ACCA referred to burglary in the "generic sense in which the term is now used in the criminal codes of most States," to wit: "an unlawful . . . entry into or remaining in a building or other structure, with the intent to commit a crime." 495 U.S. at 599, 110 S. Ct. at 2158. The Court, though, recognized that some states' statutory definition of burglary was broader than the generic definition; for example, a burglary statute could criminalize entry into places other than buildings or structures, such as boats or cars. Id. at 599-600, 110 S. Ct. at 2158-59. The existence of these "non-generic" statutes raised a significant question: if the defendant was convicted under a non-generic statute, but the underlying facts of his offense, e.g., he broke into a building, not a boat, would have secured a conviction under a generic statute, what evidence could the sentencing court consider to show the facts underlying the defendant's conviction.

The Taylor Court held that a sentencing court was generally limited to considering "the

Ortiz, 450 F.3d 1271, 1274 n.4 (11th Cir. 2006) ("Under the Taylor line of cases in this Court, evidentiary limitations on the district court's application of sentencing enhancements apply in both ACCA and non-ACCA cases.").

Addressing an argument similar to that made by Brown, we held in United States v. Cantellano, 430 F.3d 1142, 1147 (11th Cir. 2005), that Shepard's evidentiary restrictions are non-constitutional and apply only to the second stage of the district court's determination of whether a prior offense constitutes a predicate offense for the imposition of the career offender enhancement. See also United

statutory definition of the prior offense," but could also consider a limited range of highly conclusive evidence, such as an indictment and jury instructions, to show the facts underlying a conviction for a "non-generic" burglary based on a guilty verdict. Id. at 600-02; 110 S. Ct. at 2159-60. The Court based its holding on its interpretation of the ACCA and its prudential concern that allowing less conclusive evidence to be considered would lead to mini-trials on the facts underlying a prior conviction. Id. ("In other cases, however, only the Government's actual proof at trial would indicate whether the defendant's conduct constituted generic burglary. Would the Government be permitted to introduce the trial transcript before the sentencing court or . . . present the testimony of witnesses. ").

In Shepard, the government argued that sentencing courts should be allowed to consider a more expansive range of evidence, such as police reports and complaint applications, in determining the facts underlying a guilty plea to a non-generic burglary. 544 U.S. at 21, 125 S. Ct. at 1260. The Court refused to allow such evidence, reasoning that it would undermine the rule established in Taylor: "We are, after all, dealing with an issue of statutory interpretation and the claim to adhere to case law is generally powerful once a decision has settled statutory meaning." Id. at 23, 125 S. Ct. at 1261. Rather, the Court held that a sentencing court could only consider documents, such as a transcript of the plea colloquy or a written plea agreement, that were similarly determinative as to the facts underlying a plea as the documents allowed by Taylor were to the facts underlying a guilty verdict. Id. at 20-21, 125 S. Ct. at 1259-60. A plurality of the Court reinforced its limitation on the amount of evidence allowable to the sentencing court by reasoning that in the absence of documents with the "conclusive significance of a prior judicial record" the district court would be forced to engage in fact finding as to the nature of the predicate offense which could offend the Sixth Amendment, but the Court's holding was squarely grounded on Taylor's interpretation of the ACCA. Id. at 25-25, 125 S. Ct. at 1262-63.

36

States v. Neri-Hernandes, 504 F.3d 587, 591 (5th Cir. 2007) ("Shepard does not apply when determining whether the government has satisfied its burden of proof as to the existence of a prior conviction."); United States v. Zuniga-Chavez, 464 F.3d 1199, 1204 (10th Cir. 2006) ("The [Shepard] [C]ourt did not address what documents can be used to prove the fact of a prior conviction, but was concerned only with what documents can be used to prove the facts underlying a conviction where the elements of the state crime do not precisely mirror the federal definition."). Brown's argument is focused solely on whether the court violated his constitutional rights by relying on the docket sheets to find that he was convicted of aggravated burglary, i.e., he objects to the use of the docket sheets at the first stage of the district court's analysis of his prior offenses. Brown does not argue that aggravated burglary, as defined by Ohio Rev. Code Ann. § 2911.11, is not a crime of violence under U.S.S.G. § 4B1.1 and that the district court erred in relying on the docket sheets to determine the facts underlying his convictions.[25] Thus, Brown's reliance on Shepard is entirely misplaced and our decision in Cantellano forecloses his claim.

Brown similarly misunderstands our decision in United States v. Spell, 44

---

[25] Brown, additionally, does not argue that the docket sheets lacked "sufficient indicia of reliability to support [their] probable accuracy" as evidence of the prior convictions. See United States v. Andrews, 953 F.2d 1312, 1319 (11th Cir. 1992) (quotation and citation omitted).

F.3d 936 (11th Cir. 1995). He argues that Spell stands for the proposition that a prior conviction must be demonstrated by "a judgment or comparable record of the disposition of charges." Spell simply held, however, that the district court erred in relying upon a judgment of conviction to award a career offender enhancement to the defendant, because the text of the judgment did not clearly state what specific offense the defendant had pled guilty to. Id. at 939-40. Spell said nothing about requiring a certain type of document to prove the evidence of a prior conviction, nor were the docket sheets in this case unclear as to the offense to which Brown had pled guilty.

Brown further contends that the Government failed to establish "with conclusive judicial documents" the dates for which he was incarcerated as a result of his conviction on May 29, 1980, and therefore violated his Sixth Amendment rights as elucidated in Shepard. For the reasons discussed above, this claim is without merit.

C.

Brown objects to the reasonableness of his sentence on the grounds that the court failed to consider two § 3553(a) factors: (1) the "unwarranted disparity" created between defendants convicted under § 2422(b) who were subject to the retroactive application of Searcy and those who were not, because they were

38

sentenced before <u>Searcy</u> was handed down, <u>see</u> 18 U.S.C. § 3553(a)(6); and (2) Brown's traumatic childhood and efforts to live a law abiding life after he was released from prison in 1999.

The district court did not abuse its discretion in sentencing Brown to prison for 235 months. As for Brown's first argument, we construe statutory language as to avoid absurd results, <u>see</u> <u>Merritt v. Dillard Paper Co.</u>, 120 F.3d 1181, 1188 (11th Cir. 1997), and Congress could not have intended that "unwarranted disparities" in sentencing include disparities caused by the application of statutory enhancements to defendants vis-à-vis defendants who, having been sentenced earlier, were not subject to those enhancements. Congress adds statutory enhancements and increased statutory maximums frequently; courts regularly interpret enhancements to expand or constrict their reach. Congress did not intend to prevent courts from imposing such laws or interpretations.

We find our recent decision in <u>United States v. Amedeo</u>, 487 F.3d 823, 832-34 (11th Cir. 2007), instructive as to Brown's second argument. Amadeo contended that his sentence was unreasonable because the court "improperly ignored" various mitigating factors. We explained that "in imposing a reasonable sentence, the district court need only acknowledge that it considered the § 3553(a) factors," as the district court did during its sentencing colloquy with Brown, and

39

"need not discuss each of these factors in either the sentencing hearing or in the sentencing order." Id. at 833 (quotation and citation omitted). Thus, we concluded that "although the district court's sentencing order made no mention of evidence that arguably mitigated in Amedeo's favor under § 3553(a), we cannot say that the court's failure to discuss this mitigating evidence means that the court erroneously ignored or failed to consider this evidence in determining Amedeo's sentence." Id. (quotation omitted). We reach the same conclusion as to Brown's sentencing hearing.

Brown's sentence was within the correctly calculated Guidelines range. See Talley, 431 F.3d at 788. ("Although either a defendant or the government can appeal a sentence within the Guidelines range and argue that it is unreasonable, ordinarily we would expect a sentence within the Guidelines range to be reasonable."). Although the court's justification for its sentence could have been more extensive and detailed, it appears clear to us that it based its sentence on Brown's lengthy criminal history and the need to deter Brown from committing future offenses. See 18 U.S.C. § 3553(a)(2)(C). As such, the sentence was not unreasonable.

### D.

Finally, Brown contends that the district court displayed "pervasive bias"

and a "high degree of antagonism towards Brown" during the sentencing colloquy, thereby denying him his due process right to a fair and impartial sentencing hearing.  See Cross v. State of Ga., 581 F.2d 102, 104 (5th Cir. 1978) ("Due process requires a fair trial before a fair and impartial judge.").[26]  Brown seeks as his remedy the reversal of his sentence and remand to a different judge for re-sentencing.

When counsel fails to preserve an objection to the court's allegedly biased statements, that objection may not be raised on appeal unless the appellant can demonstrate fundamental error.  United States v. Ramos, 933 F.2d 968, 974 (11th Cir. 1991).  We have suggested that fundamental error may be demonstrated by showing "such pervasive bias and prejudice that it unfairly prejudices one of the parties."  Id. at 973.

Brown offers three examples of the district court's behavior which, he alleges, indicate the court's pervasive bias towards him: (1) the court's lengthy statement to Kreiss in response to his Ex Post Facto objection, which Brown characterizes as demonstrating the court's predetermined intent to sentence him as a career offender; (2) the court's statements to the prosecutor that he should get

_____

[26] In Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted, as binding precedent in the Eleventh Circuit, all decisions of the former Fifth Circuit announced prior to October 1, 1981.

the documents necessary to substantiate Brown's December 21, 1979, conviction "in case this comes back," and (3) what Brown characterizes as the court's "ridicule" of Kreiss for his objections to the use of the Ohio convictions as predicate offenses, such as the court asking Kreiss whether he thought the docket sheet "said he was charged with jaywalking."

Brown focuses his attention on the following segment of the court's colloquy with Kreiss, recited in whole <u>supra</u> part I.D, regarding his Ex Post Facto objection: "then we'll just put them aside and accept the guidelines as advisory, including the career offender provision, and we will sentence him outside the guidelines to the same sentence and say it's reasonable."

If the court's statement to Kreiss indicated that the court had reached some unshakeable conclusion as to Brown's sentence prior to the hearing, it would be cause for concern. The statement, though, taken in its full context, is simply the court's attempt to explain to Kreiss why his Ex Post Facto objection was without merit by discussing the procedure under which Brown would be sentenced. To paraphrase, the court was stating that the Guidelines were no longer mandatory and therefore Brown's classification as a career offender was not determinative as to the sentence he would receive; rather, the court could award any reasonable sentence.

42

After making the statement to which Brown objects, the court considered Kreiss's challenge to the admission of the three Ohio convictions as predicate offenses, ruling in his favor as to one conviction. The court then heard argument from Kreiss as to Brown's horrific upbringing and attempts to raise his family and start a business after his release from prison in 1999 and testimony to the same effect from Brown and Cathleen Nunez, his sister. Thus, "nothing in the record of this case compels us to conclude that the district judge closed his mind to evidence favorable to the appellant before the sentencing proceedings were concluded." United States v. Greenman, 700 F.2d 1377, 1379 (11th Cir. 1983) (holding that judge's comment "[I] had already made a decision as to what the sentence should be in this case" in response to appellant's objection to admission of evidence in sentencing hearing did not evidence bias when the comment, understood in context, referred to the specific objection made by appellant and "[t]he judge below did not refuse or fail to consider any evidence or argument favorable to appellant. He reviewed all relevant reports and gave appellant an opportunity to speak before imposition of the sentence.") (quotation omitted); see United States v. Vernier, 152 Fed. Appx. 827, 833-834 (11th Cir. 2005) (unpublished) (holding that district court's announcement that it intended to depart from the Guidelines, made at the start of sentencing hearing, did not evidence bias when court allowed

"defense to argue both the facts and the law at the hearing").

Brown's two other examples of bias do not warrant extended discussion. As the Supreme Court has explained, "judicial remarks during the course of a trial that are critical or disapproving of or even hostile to counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge . . . they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." Liteky v. United States, 510 U.S. 540, 555, 114 S. Ct. 1147, 1157, 127 L. Ed. 2d 474 (1994). The comments that Brown calls to our attention do not reveal such a "high degree" of antagonism on behalf of the district judge. Cf. Sandstrom v. Butterworth, 738 F.2d 1200, 1213-14 (11th Cir. 1984) (holding that judge's statements that petitioner was "rude and nasty" and "acting like an animal" were sufficient to indicate bias to the degree that it denied petitioner a fair tribunal).

IV.

For the reasons herein stated, the judgment of the district court is AFFIRMED.